1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  ALEXANDER R. SOTO,                      Case No.   1:21-cv-00691-JLT-HBK (HC)

12              Petitioner,                  FINDINGS AND RECOMMENDATIONS TO
                                             DENY PETITIONER'S PETITION AND
13        v.                                 DECLINE TO ISSUE A CERTIFICATE OF
                                             APPEALABILITY [1]
14  KEN CLARK,
                                             FOURTEEN-DAY OBJECTION PERIOD
15              Respondent.

16

17

18     **I.      STATUS**

19          Petitioner Alexander R. Soto ("Petitioner" or "Soto"), a state prisoner, is proceeding pro

20  se on his Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on April 26, 2021.

21  (Doc. No. 1, "Petition").  Petitioner challenges his August 28, 2017 judgment of conviction after

22  a jury trial for: (1) murder in violation of Penal Code § 187(a); (2) assault on a police officer in

23  violation of Penal Code § 245(c),[2] and evading an officer with willful or wanton disregard for

24  safety in violation of  Vehicle Code, § 28000.2(a)[3] for which he was sentenced by the Fresno

25

_____

26  [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
    (E.D. Cal. 2022).
27  [2] Counts 1 and 2 stemmed the incident that took place on February 8, 2013.
    [3] This count was count 4 of the complaint and stemmed from a different incident that took place on
28  September 8, 2012. The jury acquitted Petitioner of count 3.

1  Superior Court to an aggregate term of six years, eight months determinate, followed by a

2  consecutive indeterminate term of fifteen years to life (Case No. F13901747).  (Doc. No. 11 at10,

3  ¶ 1; Doc. No. 12-9 at 2).[4]  The Petition advances the following (restated) grounds for relief:

>     (1) Petitioner Was Denied His Sixth Amendment Right to Present a
>     Complete Defense and Testify on His Own Behalf When the Court
>     Sustained an Objection During His Testimony;
>
>     (2) The Trial Court Failed to Instruct on Vehicular Manslaughter as
>     a Lesser Included Offense to Murder in Violation of Petitioner's
>     Due Process and Fair Trial Rights Under the Sixth and Fourteenth
>     Amendments; and
>
>     (3) The Trial Court's Failure to Instruct on Vehicular Manslaughter
>     Denied Petitioner the Opportunity to Present a Complete Defense.

10  (*See generally* Doc. No. 1 at 9-20).  Respondent filed an Answer (Doc. No. 11) and lodged the

11  state court record in support (Doc. No. 12, 12-1 through 12-21).  Petitioner filed a Reply to the

12  Answer.  (Doc. No. 19).  This matter is deemed submitted on the record before the Court.  After

13  careful review of the record and applicable law, the undersigned recommends the district court

14  deny Petitioner relief on his Petition and decline to issue a certificate of appealability.

15  **II.    GOVERNING LEGAL PRINCIPLES**

16  **A.    Evidentiary Hearing**

17  "In deciding whether to grant an evidentiary hearing, a federal court must consider

18  whether such a hearing could enable an applicant to prove the petition's factual allegations,

19  which, if true, would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550

20  U.S. 465, 474 (2007).  "It follows that if the record refutes the applicant's factual allegations or

21  otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."

22  *Id*.  This Court finds that the pertinent facts of this case are fully developed in the record before

23  the Court; thus, no evidentiary hearing is required.

24  **B. AEDPA General Principles**

25  A federal court's statutory authority to issue habeas corpus relief for persons in state

26  custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

27

28  [4] All citations to the pleadings and record are to the page number as it appears on the Case Management and Electronic Case Filing ("CM/ECF") system.

Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then the AEDPA mandates a deferential, rather than *de novo*, review. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016). This deferential standard, set forth in § 2254(d), permits relief on a claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is both mandatory and intentionally difficult to satisfy. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision. *White*, 572 U.S. at 419. Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law. 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court precedent if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas

1   relief so long as fair-minded jurists could disagree on the correctness of the state court's

2   decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  The petitioner must show that the

3   state court decision "was so lacking in justification that there was an error well understood and

4   comprehended in existing law beyond any possibility for fair-minded disagreement." *Id*. at 103.

5          When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

6   State court shall be presumed to be correct [,]" and the petitioner bears "the burden of rebutting

7   the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt

8   v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

9   merely because the federal habeas court would have reached a different conclusion in the first

10  instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

11         Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

12  constitutional error had a "substantial and injurious effect or influence" on the verdict.  *Brecht v.

13  Abrahamson*, 507 U.S. 619, 637 (1993).  As the Supreme Court recently explained, while the

14  passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate

15  *Brecht's* actual-prejudice requirement.  *Brown v. Davenport*, —— U.S. ——, 142 S. Ct. 1510,

16  1524 (2022).  In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies.

17  *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether or not' AEDPA

18  applies.") (*citing* Fry v. Pliler, 551 U.S. 112, 121 (2007)).  In short, a "federal court must deny

19  relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA.  But to grant

20  relief, a court must find that the petition has cleared both tests." *Id*. at 1524.

21         As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

22  an "adjudication on the merits" in state court.  An adjudication on the merits does not require that

23  there be an opinion from the state court explaining the state court's reasoning.  *Richter*, 562 U.S.

24  at 98.  "When a federal claim has been presented to a state court and the state court has denied

25  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

26  of any indication or state-law procedural principles to the contrary." *Id*. at 99.  "The presumption

27  may be overcome when there is reason to think some other explanation for the state court's

28  decision is more likely." *Id*. at 99-100.  This presumption applies whether the state court fails to

4

discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision to apply the deferential standard.  When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.  But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id*. at 1196.

## III.    RELEVANT FACTUAL BACKGROUND

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Fifth District Court of Appeal.  A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

**Factual and Procedural Background**

> While driving a vehicle, defendant fled from police on three separate occasions in 2005, 2012 and 2013, resulting each time in high-speed police pursuits. While the 2005 and 2012 incidents resulted in little damage to property and no injury to any person, the 2013 police chase culminated in another motorist's death when defendant drove through a red light at a high rate of speed and collided with another vehicle passing through the intersection. Defendant's evasion of officers in 2005 resulted in a conviction when defendant pleaded guilty to evading officers in violation of [California] Vehicle Code section 2800.2. Defendant's two separate attempts to evade officers in 2012 and 2013 were charged separately, but the cases were consolidated and tried together. The consolidated information charged defendant with three counts in connection with the 2013 chase: murder pursuant to [California Penal Code] section 187, subdivision (a); assault upon a peace officer under [California Penal Code] section 245, subdivision (c); and transport for sale of a controlled substance under [California Health and Safety Code] section 11379, subdivision (a). In connection with the 2012 chase, defendant was charged with a

5

single count of evading an officer in willful disregard for safety of persons or property under [California] Vehicle Code section 2800.2, subdivision (a).

Relevant to the murder charge and establishing malice, the evidence at trial included testimony and documents related to defendant's prior conviction for evading officers in 2005 and testimony about whether defendant was aware of the danger to human life his evasion of officers in 2005, 2012 and 2013 posed.[1] The evidence presented at trial regarding these three police pursuits is summarized below.

[Fn1] Defendant was acquitted on count 3 for the crime of transport for sale of a controlled substance under [California] Health and Safety Code section 11379, subdivision (a). Facts relevant to count 3 have been omitted.

## I.       Evidence Relevant to Implied Malice: 2005 Car Chase

On July 6, 2005, California Highway Patrol (CHP) Officer Axel Reyes received information from dispatch that a bail bondsman was following a known felon— later identified as defendant—in his car, and the bondsman requested CHP to intercede and make a stop of the vehicle. When Reyes located defendant driving the white Acura reported by the bail bondsman, Reyes engaged his vehicle lights and activated the sirens. Defendant did not stop, however, and sped away at approximately 90 miles per hour (mph). In attempting to evade Reyes, defendant exceeded posted speed limits, including those in residential areas, and traveled through red lights and stop signs without stopping his vehicle, which caused other vehicles to swerve and brake abruptly to avoid collisions. During the pursuit, Reyes's vehicle overheated, and he was forced to drop out of the pursuit to obtain a different car. After rejoining the pursuit, Reyes and other patrol units pursued defendant to the parking lot of an old hospital where defendant stopped his car and surrendered. Defendant was taken into custody without incident. The pursuit lasted approximately 25 minutes and covered about 30 miles.

Defendant was prosecuted and ultimately pled guilty to evading a peace officer. In the process of preparing a report for defendant's sentencing, Probation Officer Cindy Carender interviewed defendant, who told Carender he was glad nobody was hurt and that he would not "ever run from the cops again." During defendant's sentencing, he stated he was "sorry to the Highway Patrol and I'm glad nobody got hurt." The court admonished defendant as follows: "You need to understand, though, the Court cannot condone this type of conduct. It created a danger to the law enforcement officers engaged in this case, put the entire public at danger because of your actions . . .." Defendant was sentenced to prison for two years for violation of [California] Vehicle Code section 2800.2, subdivision (a).

////

////

6

## II.      September 2012: Second Car Chase

Approximately 6:00 a.m. on September 8, 2012, Fowler Police Officer Keith Berry, while on duty and driving a marked police vehicle, pulled up to a four-way stop intersection at the same time as defendant. Berry waived to defendant several times motioning him to proceed through the intersection, and when defendant did not attempt to move, Berry then flashed his search light, again indicating defendant should proceed through the intersection. When defendant did not move, Berry pulled alongside defendant's car so that their driver-side windows were lined up. Speaking through their own windows, defendant indicated Berry had the right-of-way, so he had not proceeded. Defendant appeared possibly under the influence to Berry, and he told defendant to pull over so he could talk with defendant;[2] Berry proceeded to make a U-turn behind defendant's vehicle, but defendant accelerated and left the intersection at a high rate of speed.

[Fn2] Defendant testified he could not recall Berry telling him to pull over.

Defendant then sped past a stop sign without stopping his vehicle, and Berry engaged his vehicle's lights and sirens. A chase ensued wherein defendant, exceeding the posted speed limits, drove through multiple intersections without stopping at posted stop signs or red stop lights and, in one instance, crossed over the dividing line into opposing traffic. On a non-freeway surface street, defendant turned off his vehicle's headlights in an effort to elude Berry. Defendant proceeded onto northbound Highway 99, driving at speeds near 90 mph, flashing his headlights at other vehicles so they would move out of his way. When Berry was able to pull his vehicle close enough to defendant to read defendant's license plate, Berry terminated the pursuit.[3] A felony complaint against defendant was filed in October 2012.

[Fn3] Berry testified the pursuit was terminated at the Chestnut Avenue exit in the city of Fresno because both Fowler police units pursuing defendant were the only units patrolling the city of Fowler at that time.

## III.      February 8, 2013: Third Car Chase

On Friday, February 8, 2013, CHP Officer Daniel Sanchez and Fresno Police Officer Luis Carrillo were partnered together, riding in Sanchez's marked CHP patrol car as part of a specialized multi-agency unit. At approximately 9:57 p.m., Sanchez and Carrillo stopped at an intersection for a red light and saw a white SUV parked oddly at a gas station adjacent to the intersection; they observed defendant near the vehicle and peering into the gas station's windows. Suspicious of his behavior, the officers shown their vehicle spotlight on defendant, and he immediately jumped into the SUV and proceeded to exit the gas station parking lot. The officers proceeded through the intersection, pulled over and waited for the SUV to pass them, at which time Sanchez engaged his vehicle's overhead lights. Defendant failed to stop and Sanchez

engaged his sirens. Defendant did not pull over and instead sped to 50 or 60 mph—above the posted speed limit of 40 mph— and began traveling through multiple red lights without stopping. A chase ensued.

As the chase progressed, defendant continued to exceed the speed limit, failed to stop at multiple red lights and, at one intersection, turned into oncoming lanes of traffic. When defendant drove over the raised median to correct his vehicle position, he nearly collided with the officers' vehicle. A few intersections later, defendant turned in an unexpected direction and made contact with Sanchez and Carrillo's vehicle.

Defendant continued driving through residential neighborhoods, failed to stop for any stop sign and maintained speeds of 50 to 60 mph. Defendant turned off his vehicle headlights to evade officers, after which a spike strip was deployed in an effort to damage defendant's tires and slow the chase. CHP Sergeant Salcido took over as primary when Sanchez's car began malfunctioning due to the collision with defendant's vehicle. Meanwhile, defendant continued to flee at speeds of 70 to 80 mph, swerved into opposing lanes of traffic while taking a turn too quickly, sped through a shopping center, failed to yield for a pedestrian in a crosswalk and ignored stop signs and red lights. Once he passed the shopping center, defendant reached speeds of 70 to 80 mph while blowing through red lights.

When defendant reached the intersection of Bullard and Chestnut, the light was red for defendant; defendant barreled into the intersection at over 80 mph and collided with a vehicle in cross traffic. Defendant's SUV spun out of control, came to a stop next to a fenced agricultural area, and defendant exited his vehicle, jumped the fence and fled; officers apprehended defendant in the adjacent field, and he was taken into custody. Mark Bourdase, the driver of the other vehicle with whom defendant collided, was rushed to Community Regional Medical Center where he presented with multiple injuries, including traumatic brain injury. Bourdase died eight days later as a result of injuries from the crash. A felony complaint was filed on February 22, 2013.

**IV. Defendant's Testimony**

A. Evading Officers in 2005

Defendant testified a marked police vehicle attempted to pull him over on Highway 168 near Fresno, but he refused to stop and continued at speeds up to 80 mph until he exited the highway; he traveled through residential neighborhoods at 30 to 40 mph, failed to stop at red lights and stop signs and finally stopped his car in an old hospital parking lot. Defendant acknowledged he was sentenced to prison as a result of the incident, and at the time of his sentencing, he remembered saying he was glad no one was hurt. Defendant further admitted he had told a probation officer who interviewed him before his 2005 sentencing that he would never run

from the police again, and acknowledged he said that because he knew it was dangerous to run from the police.

## B.  Evading Officers in 2012

Defendant testified he was not in his "right state of mind" during the 2012 chase because he had been using methamphetamines. Defendant admitted he drove away from the intersection after his interaction with Berry, but did not recall the officer telling him to pull over. Defendant admitted to driving 40 to 50 mph on surface streets with a posted speed limit of 25 mph, failing to stop for stop signs, driving in an oncoming lane of traffic, blacking out his vehicle lights in an attempt to evade the officer and, upon entering the highway, speeding up to 80 mph until Berry terminated his pursuit near the city of Fresno. When asked on cross examination if he "knew the whole time that the behavior that [he was] engaging in was dangerous to human life," defendant answered, "[c]orrect."

## C.  Evading Officers in 2013

On both direct and cross-examination, defendant admitted that during his attempt to evade officers in his vehicle he failed to stop for numerous stop signs and red lights at various intersections, drove into oncoming traffic on Shields Avenue, drove 40 to 50 mph in residential neighborhoods where the speed limit was 25 mph, drove 60 to 70 mph on streets with speed limits of 40 to 50 mph, collided with a law enforcement vehicle on Andrews Street, and blacked out his vehicle lights in an attempt to evade officers.

Defendant also testified about his state of mind during the February 2013 pursuit. At the point of the pursuit where defendant had crossed into oncoming traffic on Shields Avenue, defense counsel asked, "[W]hat's going through your head at that time?" Defendant responded, "I'm thinking I shouldn't be on this side of the road" and that "I need to find a place to pull over or, you know, I need to get on the right side of the road." Defendant testified that when he saw vehicles coming at him in the oncoming lane of traffic he was "thinking that [he needed] to get on the right side of the road. So what I did, I immediately got over to the right side of the road with proper traffic that I was supposed to be going with." Defendant explained he was "trying to be careful so [he] wouldn't cause an accident" and that he "didn't want to hit" any other vehicles. Defense counsel again asked defendant what was going through his mind when he was near the intersection of Maroa and Shields Avenues, and defendant responded, "I'm, like, I didn't even do anything at first, so I'm thinking to myself, 'Why are they really after me? Like, what did I do?'" As defendant testified about hearing a noise when the spike strip was deployed, defense counsel asked why he was not stopping his car at that point. Defendant responded that he was just trying to get away from the officers. Defense counsel then asked, "When you say that you're thinking about just trying to get away from the officers, you're going, by your description, 50, 60 miles per hour south down Palm. Are you thinking at this point that someone can be hurt?"

The prosecution objected on relevance and leading grounds, and the court sustained the objection, instructing defendant he could not answer the question. Defense counsel then rephrased the question: "I'm going to ask you, when you say that you're just trying to get away, are you thinking anything else?" Defendant answered, "Well, trying to find an area to pull over."

Defendant further testified he went through an area near a mall and explained he knew "it's busy right there, so I'm trying to avoid an accident . . .." Defendant admitted the chase ended when he hit a vehicle at the intersection of Bullard and Chestnut; he testified he was in shock and ran from the car because he was not in his "right state of mind" as he had been using methamphetamines a few hours before the chase began.

On cross-examination, defendant acknowledged more than 10 times he knew at the time he was evading officers his driving conduct was generally dangerous behavior and also admitted he knew at the time it was specifically dangerous to human life, but he chose to engage in the conduct anyway.

(Doc. No. 12-19 at 3-9).

## IV.     ANALYSIS

Respondent acknowledges that each of Petitioner's grounds was raised on direct appeal to the Fifth Appellate District Court, denied on the merits (Doc. No. 12-19 at 1-38), subsequently raised, and summarily denied by the California Supreme Court (Doc. No. 12-21).  Thus, the three grounds are exhausted, and the Court looks through to the Fifth Appellate District's reasoned decision in evaluating each of Petitioner's claims under the deferential standard of review. *Wilson v. Sellers*, 138 S. Ct. at 1192.

### A.  Ground One-Sustaining Objection Denied Petitioner Fair Trial

In his first ground for relief, Soto argues he was denied due process rights and the right to present a defense and testify in his own behalf when the trial court improperly sustained the prosecution's objection to a single question during his direct examination testimony.  (Doc. No. 1 at 9).  Soto argues the trial court error precluded him form offering testimony concerning his state of mind during the 2013 incident, which was relevant to the issue of implied malice.  (*Id.* at 9-13). Petitioner argues the trial court "error was prejudicial" under *Chapman v. California*, 386 U.S. 18 (1967).  (*Id.* at 12-13).  Respondent argues that the state appeal court's denial of this claim, which was undisturbed by the California Supreme Court, was not contrary to any clearly established

1    federal law.  (Doc. No. 11 at 17).

2         The record reveals the following exchange took place during Petitioner's direct

3    examination by his defense counsel.

4         Q   Okay. And at this point when you're on Palm in the time frame
          of hearing the noise, why aren't you stopping your car at this point?
5
          A   Because I'm just trying to get away from the officers.
6
          Q   When you say that you're thinking about just trying to get away
7         from the officers, you're going, by your description, 50, 60 miles
          per hour south down Palm. Are you thinking at this point that
8         someone can be hurt?

9         MS. PEBET:    Objection, relevance, leading.

10        THE COURT:    Sustained. You can't answer that question.

11        MR. BALY:    Q   I'm going to ask you, when you say that you're
          just trying to get away, are you thinking anything else?
12
          A   Well, trying to find an area to pull over.
13
          Q   When you say that you're trying to find an area to pull over,
14        why don't you just stop there on Palm?

15        A   Because I was not in a well-lighted area, and I didn't want to
          get mistreated.
16

17   (Doc. No. 12-7 at 63:21-25 to 64:1-14).

18        After evaluating the objection under state law court and "assuming the question was

19   neither leading nor irrelevant," the appellant court found that "any error by the trial court in

20   sustaining the prosecution's objection was harmless."  (Doc. No. 12-19 at 14).  The court then

21   went on to address at length Petitioner's claimed federal constitutional right and ultimately

22   concluded any error was harmless.

23        2. No Federal Constitutional Right Was Violated

24        Defendant argues the trial court's exclusion of this specific
          testimony violated his Fifth, Sixth and Fourteenth Amendment
25        rights under the federal Constitution to testify on his own behalf
          and to present a complete defense. Thus, he maintains any harmless
26        error test must be conducted pursuant to the standard articulated in
          *Chapman v. California* (1967) 386 U.S. 18, which applies when an
27        error implicates federal constitutional rights.

28

                                       11

However, "the routine application of provisions of the state Evidence Code law does not implicate a defendant's constitutional rights." (*People v. Jones* (2013) 57 Cal.4th 899, 957.) As such, "only evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4.) Additionally, "the right to present relevant testimony" in one's own defense "is not without limitation." (*Rock v. Arkansas* (1987) 483 U.S. 44, 55.) "So long as the restrictions placed on a defendant's right to testify are not 'arbitrary or disproportionate to the purposes they are designed to serve,' a court may apply a rule of evidence to limit a defendant's testimony if 'the interests served by [the] rule justify the limitation imposed on the defendant's constitutional right to testify.'" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 822, quoting *Rock v. Arkansas, supra*, at p. 56.) Excluding defendant's answer to one question about whether he thought anyone could be hurt at a particular time during the 2013 chase was not tantamount to a complete preclusion of his defense, nor did it interfere with defendant's right to testify on his own behalf.

During defendant's direct examination, defense counsel asked several times what defendant was thinking at various points in the 2013 car chase. In response, defendant testified about what he was thinking when he drove into oncoming traffic on Shields Avenue, what he was thinking when he saw vehicles coming at him, and what he was thinking as he crossed back over the median into the correct lane of traffic. Defense counsel asked what was "going through [defendant's] mind" when he arrived at another intersection, and defendant testified he was wondering why the police were after him. Later, after the court sustained the prosecutor's objection to the question about what defendant was thinking while driving on Palm Avenue, defense counsel rephrased his question to ask whether defendant was "thinking anything else" at this time. In closing argument, defense counsel again addressed defendant's state of mind and his asserted lack of awareness of the risks of his behavior. In sum, defendant had multiple opportunities to testify about his thoughts and his subjective state of mind during the 2013 chase, and defense counsel was able to address this matter in closing argument.

Defendant contends that while he may have been able to testify about what he was thinking generally, after the objection to his counsel's question was sustained, the trial court specifically instructed defendant, "You can't answer that question." Defendant was left with the impression he was entirely precluded from testifying about whether he was thinking anyone could be hurt, and defendant believed this preclusion applied no matter how the question was reframed.

*People v. Thornton* (2007) 41 Cal.4th 391, 442–443 is instructive. In *Thornton*, the trial court excluded a videotape offered as mitigation evidence on the ground that it was hearsay evidence, which offered opinions that were not subject to cross-examination. (*Id*. at p. 443.) On appeal, the California Supreme Court rejected the defendant's argument the exclusion of the videotape violated his

federal constitutional right to present a defense. (*Id*. at p. 444.) The court noted that while the videotape was excluded in its entirety, nothing had prevented the defendant "from presenting evidence consistent with the normal rules of evidence through live witnesses who are subject to cross-examination." (*Ibid*.)

The same is true here. Whether defendant thought anyone could be hurt may be relevant, but it is not the essential mental component of implied malice, which requires that an actor knows his conduct is dangerous to human life. (*Knoller, supra*, 41 Cal.4th at p. 156 [malice requires proof that a defendant acted with conscious disregard of the danger to human life; simple awareness of causing serious bodily injury is not sufficient].) Thus, even assuming the court's admonition led defendant to believe he was entirely precluded from testifying about whether he thought anyone could be hurt, defendant was not precluded from answering different and more specific questions about his subjective awareness (or lack thereof) of the dangers to life his driving presented at the time. That the defense did not pursue different questions about defendant's awareness of the dangers to life his conduct posed does not mean he was precluded from doing so in the same way *Thornton* was not precluded from presenting live witness testimony—that one is not prepared or chooses not to present certain evidence in an admissible form is not the same as being precluded from doing so. (*See Thornton, supra*, 41 Cal.4th at pp. 443–444.) And, prior to the objection, defendant had been able to testify several times about what he was thinking at various points in the chase. (*People v. Gutierrez, supra*, 45 Cal.4th at p. 822 [evidentiary restriction on the defendant's testimony as to one aspect of a past event did not interfere with the defendant's right to testify on his own behalf].) The exclusion of one answer to a question was not a complete preclusion of defendant's right to present his defense nor did it constitute a violation of his right to testify on his own behalf; defendant's federal constitutional rights were not implicated by the trial court's exclusion of this portion of defendant's testimony.

3. Any Error Was Harmless

As this exclusion of testimony did not violate defendant's federal constitutional rights, any error by the trial court in excluding defendant's answer to a single question was one of state law only. (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) Thus, the applicable harmless error standard is whether it is reasonably probable defendant would have obtained a more favorable result in the absence of the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Under this standard, we conclude any error in excluding this testimony was harmless.

Even assuming defendant testified he was not thinking anyone could be hurt while he was driving on Palm Avenue, it is not reasonably probable the jury would have returned a more favorable verdict. During his cross-examination, defendant admitted multiple times he knew when he was fleeing from officers in 2013 that his driving was dangerous to human life and acknowledged that despite knowing this, he engaged in the conduct anyway. The jury also

13

1

2

3

4

5

> heard defendant acknowledge he had been convicted of evading officers in 2005 after leading them on a 30-mile, high-speed car chase and that the judge who sentenced him for that offense expressly warned him of the dangerousness of this conduct; defendant also admitted he knew at the time of his 2005 sentencing his evasion of officers had been dangerous to human life. Defendant also admitted he told a probation officer in advance of sentencing that he would never run from the police again, and he confirmed he said that because he knew the conduct was dangerous.

6

7

8

9

10

11

> Based on all the evidence before it, it is clear the jury reached the overwhelming conclusion that defendant, at the time of the 2013 car chase, knew his driving in a manner to evade officers (which, according to trial testimony, included high speeds, blacking out his vehicle's lights, failing to stop for multiple red lights and stop signs, speeding through residential areas, and driving into oncoming lanes of traffic) was dangerous to human life, but despite this knowledge he engaged in the conduct anyway. Any error in excluding his testimony about what he was thinking while driving on Palm Avenue was harmless. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

12

(Doc. 12-19 at 20-23).

13

14

15

16

17

18

19

20

21

22

23

24

Whether ingrained in the Due Process Clause of the Fourteenth Amendment, or the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees "criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S 479, 485 (1984). A federal habeas court may not review state court's evidentiary ruling when evaluating whether an exclusion of evidence prevented a defendant from presenting a complete defense unless constitutional rights are affected. *Rivera v. Illinois*, 556 U.S. 148, 158-60 (2009) (errors in application of state law not cognizable on habeas review). And even if a trial court's exclusion of evidence amounts to constitutional error, a habeas petitioner still is not entitled to habeas relief unless such error had a "substantial and injurious effect" upon the verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *see also Fry v. Pliler*, 551 U.S. 112, 119 (2007) (harmless error standard applied in federal habeas review of trial-type errors).

25

26

27

28

A federal habeas petition will not be granted "if the state court simply erred in concluding the state's errors were harmless; rather, habeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner." *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003). Petitioner argues for, and the state appellate court analyzed Petitioner's claim

under the *Chapman* standard of harmlessness applies for constitutional error, but federal habeas

courts utilize the standard set forth in *Brecht v. Abrahamson*, 507 U.S. at 637-38. *Brecht* requires

an analysis of whether the constitutional error had a "substantial and injurious effect or influence

in determining the jury's verdict." When a state court finds a constitutional error harmless under

the *Chapman* standard, a federal court may not grant habeas relief unless it determines both that

the state court's decision was contrary to or an unreasonable application of *Chapman*, and that the

petitioner suffered prejudice under *Brecht*. *Inthavong v. Lamarque*, 420 F.3d 1055, 1059 (9th

Cir.2005). The reviewing court may address the two tests in any order. *Id.*

   Here, the trial court's error was harmless and further it did not have a substantial and

injurious effect or influence the jury's verdict. The record reveals that the Soto had numerous

opportunities to express what was on his mind during the pursuit by police. During his direct

examination he offered the following unobjected testimony as to what was going through his

mind:

> Q   Okay. So as you're seeing the police officers and you cross over what happened next?
>
> A   Well, I was trying to be careful so I wouldn't cause an accident.

(Doc. No. 12-7 at 55:16-19).

> …
>
> Q   Okay. Now, when you remember going around the block and you come back out on Maroa and Shields, what's going through your mind here?
>
> A   I'm, like, I didn't even do anything at first, so I'm thinking to myself, "Why are they really after me? Like, what did I do?"

(Doc. No. 12-7 at 60:1-6).

> …
>
> MR. BALY: Q   What happened next?
>
> A   Well, I come up to the River Park area, and I turn in River Park, and I know how it's busy right there, so I'm trying to avoid an accident, and I just continued to get chased, so I went through River Pack and came out on the other side.

(Doc. No. 12-7 at 66:23-26, 67:1-2).

Q   Okay. So on this roadway you describe regular traffic.· Does your vehicle encounter the regular traffic? Does it slow you up?

A   Yes.

Q   And how does it do that?

A   To avoid me of not hitting anybody.

(Doc. No. 12-7 at 69:17-22).

In fact, during cross examination Soto admitted he knew he was engaged in dangerous behavior on the day of the incident:

Q   And you know the speed limit is approximately 25 miles an hour in that area, don't you?

A   Correct.

Q   And, in fact, you're passing posted speed limit signs when you're doing all of this, aren't you?

A   Correct.

Q   And so despite all of that, despite seeing those posted speed signs, despite seeing the officers behind you, and knowing what you were doing from that 2005 case, you kept going, didn't you?

A   Correct.

Q   And you knew that that behavior was dangerous to human life?

A   Correct.

Q   And you did it anyway?

A   Correct.

(Doc. No. 12-7 at 153:1-16).

….

Q   And at this point, you're now well into this pursuit, and you, I think earlier just said, you're just trying to get away at this point, right?

A   Yes.

Q   And, in fact, you're speeding through intersections, not stopping for lights, and you know that that was dangerous to human life?

A   Yes.

16

Q   And you were doing it nonetheless, meaning anyway?

A   Well, I wasn't trying to hurt no nobody.

(Doc. No. 12-7 at 164:15-25).

Q   But as you sit here today you blame it on drugs and law enforcement officers?

A   Well, yeah because in 2005 nobody got hurt.

(Doc. No. 12-7 at 186).

Thus, the record above reflects that Petitioner had the opportunity to testify and put on a full defense.  Further, the record reveals that the jury likewise heard overwhelming testimony of the speed he drove, the number of red lights he ran, the various maneuvers he undertook, including driving on the wrong side of the street and blacking out his lights before the collision. Petitioner, himself, acknowledged both in his previous cases and the current case that he knew his actions were dangerous and could have resulted in injury to persons.   Based upon a review of the record, the error by the trial court in sustaining the prosecution's objection to the question posed to the Petitioner on direct examination did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

Considering the foregoing, the California court of appeal's denial of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court nor based on an unreasonable determination of the facts in light of the evidence presented.  Consequently, Petitioner is not entitled to relief on Ground One.

**B. Ground Two - Jury Instruction**

Petitioner assigns prejudicial error to the trial court for failing to instruct the jury on vehicular manslaughter, a lesser included offense of the charged crime.  (Doc. No. 1 at 14).  Soto contends that contrary to the trial court's finding, Vehicular Manslaughter under section 192(c) of the Penal Code is a lesser included offense of second-degree murder because he "factually killed the victim after a car pursuit with police."  (*Id*.).  Petitioner argues there was a reasonable

probability the jury would have convicted him of the lesser offense had they been instructed. (*Id.*).

At trial, defense counsel requested a vehicular manslaughter instruction as a lesser included offense to murder based on the evidence that the defendant did not consciously disregard human life while fleeing from law enforcement.  (Doc. No. 12-19 at 18).  The prosecution objected and the trial judge declined the requested instruction "finding vehicular manslaughter was not a lesser included offense of murder pursuant to *People v. Sanchez* (2001) 24 Cal.4th 983 (*Sanchez*)."  (*Id.*).

After examining the statutes and elements under state law and the historical development of caselaw, the state appellate court found no error by the trial judge's omission of an instruction on vehicular manslaughter.  (Doc. No. 12-19 at 18-31).

> "Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117 (*Birks*).) Thus, there are two methods for determining whether a lesser offense is necessarily included in a greater offense: the elements test and the accusatory pleading test. . ..
>
> . . .
>
> In sum, we find nothing in *Sanchez* to indicate any form of vehicular manslaughter may be treated as a lesser necessarily included offense within murder where it requires proof of additional elements. Specifically, vehicular manslaughter committed with gross negligence under section 192(c)(1) requires proof the actor was driving a vehicle in the commission of the offense, an element that is not required for murder. Under the elements test, vehicular manslaughter under section 192(c)(1) is not a lesser necessarily included offense within murder. (*Sanchez, supra*, 24 Cal.4th at p. 992.) As such, the trial court had no duty to instruct the jury on this offense.

(Doc. No. 12-19 at 19, 29).  Initially, this Court is bound by the state court's conclusion that the vehicular manslaughter instruction was not required under state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

1    The state court further determined that "no due process rights under the federal

2    Constitution were implicated by the trial court's refusal to instruct on vehicular manslaughter."

3    (Doc. No. 12-19 at 29).

Pursuant to *Sanchez*, vehicular manslaughter under section 192(c) is not a lesser included offense of murder. (Sanchez, supra, 24 Cal.4th at pp. 991–992.) At most, vehicular manslaughter is a lesser related offense and "there is no federal constitutional right of a defendant to compel the giving of lesser-related-offense instructions." (*People v. Rundle, supra*, 43 Cal.4th at p. 148, disapproved on another ground by *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.) Moreover, even the trial court's obligation to instruct on lesser included offenses is based on state constitutional law, not the United States Constitution. (*People v. Rundle, supra*, at p. 142, *citing People v. Breverman* (1998) 19 Cal.4th 142, 154– 155; see *People v. Wolfe, supra*, 20 Cal.App.5th at p. 688 [finding no federal constitutional right to vehicular manslaughter instruction as lesser included of murder].) Even assuming vehicular manslaughter were a lesser included offense of murder, which it is not, there is no federal constitutional right to the instruction in noncapital cases. (*People v. Rundle, supra*, at p. 142.)

Defendant maintains the lack of an instruction on vehicular manslaughter resulted in the jury receiving incomplete instructions on the implied malice element because the vehicular manslaughter instruction would have informed the jury that, without defendant's subjective awareness of—and conscious disregard for—the risk to life, implied malice would be lacking. Defendant contends this is analogous to where a court fails to instruct on heat of passion voluntary manslaughter as a lesser included of murder, which results in the jury receiving incomplete instructions on the malice element. We are not persuaded.

Here, the jury was instructed on implied malice, and defendant was free to argue—and did argue—the prosecution had failed to prove that element of the crime. An instruction on vehicular manslaughter would not have clarified the implied malice standard, and defendant's comparison to heat of passion instruction in murder cases is inapposite. Evidence of heat of passion may negate the malice element of murder (*People v. Rios, supra*, 23 Cal.4th at p. 462); when murder and manslaughter are considered in the same case and heat of passion is put in issue, federal due process requires the prosecutor prove malice beyond a reasonable doubt by proving sufficient provocation or heat of passion was lacking. (*Id.* at pp. 461–462; *Mullaney v. Wilbur* (1975) 421 U.S. 684, 703 ["We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case."]) In that situation, it is necessary to instruct on the heat of passion and/or provocation. Unlike the heat of passion in voluntary manslaughter, the requisite gross negligence state of mind for vehicular manslaughter under section 192(c)(1) does not necessarily negate the element of implied malice, nor is it a

1

2

3

4

> mitigating circumstance that implicates the federal due process
> concerns. The instruction pertaining to implied malice was not
> rendered incomplete for lack of an instruction on vehicular
> manslaughter. We conclude no due process rights under the federal
> Constitution were implicated by the trial court's refusal to instruct
> on vehicular manslaughter.

5   (Doc. No. 12-19 at 29-31).

6       Respondent correctly notes that Ground Two fails to state a cognizable federal habeas

7   claim because Petitioner cannot show that the state court's decision was contrary to clearly

8   established federal law.  Federal habeas review is limited to deciding whether a state court

9   decision violates the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a);

10  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam).  While the Supreme Court has held

11  the failure of a state court to instruct on a lesser included offense in a capital murder case is error

12  if there was evidence to support a lesser include offense instruction, *Beck v. Alabama*, 447 U.S.

13  625, 638 (1980), the Supreme Court reserved judgment as to "whether the Due Process Clause

14  would require the giving of such instructions in a noncapital case[.]"  *Id.* at 638 n.14; *see also*

15  *Keeble v. United States*, 412 U.S. 205, 213 (1973) (The Supreme Court has "never explicitly held

16  that the Due Process Clause of the Fifth Amendment guarantees the right of a defendant to have

17  the jury instructed on a lesser included offense. ...").  And, the Ninth Circuit Court has made clear

18  that "the failure of a state trial court to instruct on lesser included offenses in a non-capital case

19  does not present a federal constitutional question."  *Windham v Merkle*, 163 F.3d 1092, 1106 (9th

20  Cir. 1998); *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam).

21      Therefore, it was not objectively unreasonable for the state appellate court to conclude

22  that Soto has no valid federal due process claim to support habeas relief based on the omission of

23  a state law vehicular manslaughter instruction in this non-capital case.

24      Thus, Ground Two is without merit.

25                  **C.  Ground Three – Denial of Complete Defense**

26      In his final ground, Petitioner contends that the trial court's refusal to give an instruction

27  on vehicular manslaughter, even if not a lesser *included* offense but a lesser *related* offense,

28  deprived him of the ability to present a complete defense.  (Doc. No. 1 at 19-20).  Soto argues the

20

1    instruction was necessary for the jury to understand his defense and the trial court's refusal to

2    charge on this alternative offense denied him due process.  (*Id.*).

3            In rejecting Petitioner's claim, the court of appeal summarized California law concerning

4    lesser *related* offenses:

5            While the trial court must instruct on lesser included offenses where
             there is substantial evidence the defendant is guilty only of the
6            lesser offense (even absent a request and even over the parties'
             objections) (*People v. Breverman, supra*, 19 Cal. 4th at p. 162), the
7            same is not true for lesser related offenses.  Pursuant to the
             California Supreme Court's decision in *Birks*,[5] a defendant has no
8            right under the state Constitution to an instruction on a lesser
             related offense, and the trial court is not permitted to instruct on an
9            uncharged lesser related crime unless agreed to by the prosecution.
             ([*People v.] Birks*, [1998], 19 Cal.4th [108], 136–137.)
10

11   (Doc. No. 12-19 at 32).  This holding as to California law is binding on this Court.  *See Hicks v.*

12   *Feiock*, 485 U.S. 624, 629–30 (1988).

13           Respondent is correct that this claim is not cognizable on federal habeas review.   As

14   discussed above, there is not a federal constitutional right to instructions on lesser included

15   offenses in non-capital cases, and even less of a right to instructions on lesser related offenses.

16   *See Hopkins v. Reeves*, 524 U.S. 88 (1998) (finding Constitution does not require instructing on

17   lesser related offenses in capital cases if state does not allow them in any case; most states require

18   instructions on only on lesser-included offenses, and "we have never suggested that the

19   Constitution requires anything more.").  While in *Mathews v. United States*, the Supreme Court

20   recognized, as a matter of criminal procedure, that  "a defendant is entitled to an instruction as to

21   any recognized defense for which there exists evidence sufficient for a reasonable jury to find in

22   his favor," 485 U.S. 58, 63 (1988), it similarly has held that such "meaningful opportunity to

23   present a complete defense" does not speak to "restrictions imposed on a defendant's ability to

24   present an affirmative defense." *Gilmore v. Taylor*, 508 U.S. 333, 343 (1993).  Because no clearly

25   established Federal law exists to support the proposition that Petitioner's right to

26   ────────────────

27   [5] In reaching the *Birks* decision, the California Supreme Court considered the United States Supreme
     Court's decisions in non-capital cases that instructions of lesser included and related offenses were not
     federally mandated in *Schmuck v. United States,* 489 U.S. 705, 715-716 (1989) and *Hopkins v. Reeves* 524
28   U.S. 88, 90–91 (1998). (*Birks*, *supra*, at pp. 123–124.)

a complete defense includes the right to a jury instruction, relief is unavailable under AEDPA. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (where "[Supreme Court] cases gives no clear answer to the question presented . . . it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly Federal law.'") (*quoting Carey v. Musladin*, 549 U.S. 70, 77 (2006)). Consequently, Ground Three is without merit.

## ¶V.  CERTIFICATE OF APPEALABIILTY

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Because the petitioner has not made a substantial showing of the denial of a constitutional right, the undersigned recommends that the court decline to issue a certificate of appealability.

Accordingly, it is **RECOMMENDED**:

1.  Petitioner's Petition for Writ of Habeas Corpus (Doc. No. 1) be denied with prejudice.

2.  Petitioner be denied a certificate of appealability.

### NOTICE TO PARTIES

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen (14) days after being served with these findings and recommendations, a party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Parties are advised that failure to file objections within the

specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Dated:     September 4, 2024

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE